IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HEIDI JOHNSON, | ) | Case No. 5:25-CV-00133 |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.     Introduction

Plaintiff, Heidi Johnson ("Johnson"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards at Step Two of the sequential five step analysis, I recommend that the Commissioner's final decision denying Johnson's application for DIB be vacated and that Johnson's case be remanded for further consideration.

## II.     Procedural History

Johnson filed for DIB on May 23, 2022, alleging a disability onset date of October 15, 2018. (Tr. 170). The claims were denied initially and on reconsideration. (Tr. 66, 74). She then requested a hearing before an ALJ. (Tr. 99). Johnson, represented by counsel, and a vocational expert ("VE") testified before the ALJ on September 14, 2023. (Tr. 51-65). On November 21,

2023, the ALJ issued a written decision finding Johnson not disabled. (Tr. 37-45). The Appeals Council denied her request for review on November 21, 2024, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981). Johnson timely filed this action on January 26, 2025. (ECF Doc. 1).

III.    **Evidence**

        A.      **Personal, Educational, and Vocational Evidence**

        Johnson was 45 years old on the alleged onset date, making her a younger individual according to Agency regulations. (*See* Tr. 43). She graduated from high school. (*See id.*). She has no past relevant work experience. (*Id.*).

        B.      **Relevant Medical Evidence[1]**

        On January 24, 2018, Johnson presented for an appointment with her primary care physician, Johnique Bennett, M.D. (Tr. 559). The chief complaint for this encounter was Johnson "still feeling very fatigue[d]." (*Id.*). Dr. Bennett noted that Johnson had a history of vitamin deficiency. (Tr. 562). Johnson reported that there had been no improvement with her fatigue despite taking Iron and Vitamin D supplements. (*Id.*). Upon assessment of fatigue, Dr. Bennett noted that Johnson's Vitamins D and B12 studies were normal and recommended increased exercise and a healthy diet. (*Id.*).

        On August 21, 2019, Johnson presented to an appointment with Jennifer Thelma Minton, CNP to establish primary care. (Tr. 369). After this encounter, CNP Minton diagnosed Johnson with Vitamins D and B-Complex deficiencies. (Tr. 369, 374). CNP Minton noted that Johnson's Vitamin D deficiency was improved after Johnson began taking a Vitamin D3 supplement daily.

---

[1] As Johnson raises only legal issues that pertain to her physical fatigue impairment, this discussion will be similarly limited. Any arguments concerning her other impairments are deemed waived. See *Kuhn v. Washtenaw Cnty.,* 709 F.3d 612, 624 (6th Cir. 2013).

(Tr. 374). Johnson reported ceasing Vitamin B12 when her levels were elevated and that she had been feeling fatigued for a year. (Tr. 371). CNP Minton reviewed Johnson's lab work and reported normal levels with the exception of a slightly elevated red blood cell distribution width. (*Id.*). Johnson's Vitamin B12 value was 749 with a reference range of 193-986 pg/mL. (Tr. 376). Her Vitamin D value was 38 with a reference range of 30-100 ng/mL. (Tr. 377).

Johnson presented for a follow up appointment with CNP Minton on November 21, 2019. (Tr. 380). Johnson's chief complaint was fatigue. (*Id.*). CNP Minton diagnosed Johnson with chronic fatigue and noted it as her primary diagnosis. (Tr. *id.*, 384). Johnson was also diagnosed with acquired underactive thyroid. (*Id.*). Despite taking Vitamins D and B12 supplements, Johnson did not feel improved symptoms and reported feeling exhausted with achy joints and muscles. (Tr. 381). The pain was rated six on a ten-point scale which was worse with activity and improved with rest. (*Id.*). She reported fatigue was worse with less sleep and improved with sleep. (Tr. 381-82). Johnson reported experiencing chills, fatigue, congestion, sinus pressure, shortness of breath, diarrhea, heat intolerance, arthralgias, back pain, myalgias, environmental allergies, and headaches. (Tr. 383). CNP Minton planned to recheck Johnson's TSH, Vitamin D, and Vitamin B12 levels. (Tr. 384).

Labs from November 21, 2019 revealed that Johnson's Vitamin D level was 65. (Tr. 385). Johnson's Vitamin B12 level was 987, which was flagged as slightly elevated. (Tr. 386). Johnson's TSH had a value of 2.80 with a reference range of 0.27-4.20 mclU/mL. (Tr. 387).

At a December 3, 2019 visit for lower back pain with CNP Minton, Johnson reported on various issues that she explored as a cause for the pain – one report was that her Vitamin D levels were low at one point, had improved, yet the back pain continued. (Tr. 389). A lumbar spine x-ray revealed normal vertebral bodies in stature and alignment with preserved disc spaces,

and very gentle scoliosis lumbar spine convex the left with no spondylolysis or spondylolisthesis. (Tr. 392). CNP Minton ordered physical therapy for scoliosis and back pain on December 17, 2019. (Tr. 395, 397). At a January 28, 2020 follow up appointment, Johnson reported that her back pain improved with physical therapy but her knee pain had not. (Tr. 400). After finishing her ordered physical therapy on February 20, 2020, Johnson reported continued back and hip pain. (Tr. 404-05). At that point, in addition to physical therapy, Johnson had tried muscle relaxers, Lidoderm patches without significant improvement. (Tr. 405). She also reported side effects from the medications. (*Id.*).  CNP Minton ordered an MRI of the lumbar spine and prescribed Tizanidine for pain and spasms. (Tr. 407).

On April 3, 2020, CNP Minton noted that Johnson's back pain had improved with injections received from Dr. Wolfe. (Tr. 413).

At a yearly wellness visit on August 28, 2020 with CNP Minton, Johnson reported that she was doing well. (Tr. 422). CNP Minton noted that Johnson's Vitamin D and B12 deficiencies were chronic and not stable. (Tr. 425). Johnson's Vitamin D level was 48 and her Vitamin B12 level was 652. (Tr. 431-32).

### C.      Medical Opinion Evidence

#### i.      State Agency Reviewers

On August 16, 2022, state agency reviewing physician W. Scott Bolz, M.D., determined that Johnson was capable of lifting/carrying 50 pounds occasionally and 25 pounds frequently. (Tr. 70). She was limited to six hours of sitting, standing, and walking during an eight-hour workday. (*Id.*). She could occasionally climb ladders, ropes, or scaffolds. (*Id.*). She could frequently climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. (Tr. 71). On September 26, 2023, at the reconsideration level, state agency reviewing physician Rannie Amiri, M.D.,

confirmed Dr. Bolz's opinion with the exception that Dr. Amiri found Johnson was capable of lifting/carrying 20 pounds occasionally and 10 pounds frequently. (Tr. 78-79).

On July 26, 2022, state agency reviewing psychologist Aracelis Rivera, Psy.D., opined that there was insufficient evidence to determine whether Johnson had any mental impairments. (Tr. 69). Dr. Rivera's opinion was reaffirmed at the reconsideration level by Audrey Todd, Ph.D. (Tr. 77-78).

### D.      Administrative Hearing Evidence

Johnson testified that she completed high school and received a college degree in health care administration. (*Id.*). She has a driver's license (*Id.*). For the past 15 years, Johnson participated in primarily part-time work. (Tr. 56).

Regarding her medical issues, Johnson testified that she had severe back, hip, knee, and foot pain that ranged from throbbing to sharp. (*Id.*). She also experienced her back locking up at times. (*Id.*). Her feet, knees, and hip would burn and bring her to tears. (*Id.*). Johnson recalled that at times she could not walk after working part time hours. (Tr. 56). She occasionally required someone to pick her up from work because she could not drive. (*Id.*). Her pain continued after she stopped working. (*Id.*).

To relieve her symptoms, Johnson treated with oral medication, physical therapy, and injections. (Tr. 57).  She also tried wearing an air boot for her foot pain and undergoing a hysterectomy for her back pain. (*Id.*). None of these options fully relieved her pain. (*Id.*).

For her vitamin deficiencies, Johnson took Vitamins D and B12 as well as Iron. (*Id.*). At the time of the hearing, her vitamin levels were in normal ranges however she still had the same symptoms. (*Id.*).

The ALJ then asked whether Johnson experienced fatigue. (*Id.*). Johnson responded that she could sleep for eight hours, take a two-hour nap during the day, and still sleep for eight to ten hours the following night. (*Id.*). All the while, she would yawn throughout the day while doing minimal effort tasks. (*Id.*). She recalled feeling as though she was not refreshed after sleeping for eight hours. (*Id.*).

Johnson explained that a "good day" began with waking up, taking her children to school, coming home, and starting dinner early due to her limitations with standing and sitting and needing to alternate between the two. (Tr. 58). On a good day she may be able to also do a load of laundry. (*Id.*). When it was time, she would pick her children up and come home to finish dinner. (*Id.*). On a "good day," Johnson could walk and stand for 15 to 20 minutes before needing to stop and sit down. (*Id.*). She could sit for 15 to 20 minutes before she began shifting and needing to stand up again. (Tr. 58-59).

On a "bad day," Johnson could barely get to the bathroom after waking up due to her pain level. (Tr. 58). She stated that her husband would have to take a break from his job to pick the children up and take them to school. (*Id.*). Johnson would have to spend the day in bed because it hurt to move. (*Id.*).

During the relevant time period, Johnson estimated that for every week, she would have three to four "good days" and two to three "bad days." (*Id.*). She could comfortably carry two to three pounds. (Tr. 59). She elaborated that if she was grocery shopping using a motorized cart, picking up a gallon of milk would "do [her] in." (*Id.*). She was unable to pick up a bag of sugar from the bottom shelf at the grocery store due to the bending or squatting that task required. (*Id.*). Further, the weight of the bag of sugar would send a sharp pain from her wrist up to her shoulder. (*Id.*). Lightweight items were difficult to hold onto. (*Id.*).

At times, Johnson needed her husband's help to put her shoes on or wash her hair. (*Id.*). Johnson stated that her back hurt so bad sometimes that she could not get in the position to put on regular shoes on so she would wear shoes that she could slide on. (Tr. 59-60).

During the relevant time, Johnson's children were aged 20, 19, 16, 15, and 9. (Tr. 60). Her children helped with bringing dirty clothes downstairs, loading and transferring clothes from the washing machine to the dryer, and getting things out of the refrigerator. (*Id.*).

Johnson experienced anxiety about her medical condition, being able to help her family, and being able to work. (Tr. 61). When she stopped working, that caused more anxiety that led to depression. (*Id.*). She also experienced brain fog where she would walk into a room and forget why she walked in. (*Id.*). She would also forget what people were saying to her as they said it. (*Id.*). She experienced panic attacks about things that happened to her when she was younger from PTSD and from worrying about her children. (*Id.*). There were a few times that she had "SVT" where her heart was racing, and she had to be rushed to the hospital. (*Id.*). Johnson began mental health treatment after September 2020. (Tr. 61-62).

Prior to the VE testifying, the ALJ stated that Johnson had no past relevant work. (Tr. 56).

The VE testified that a hypothetical individual with the same age, education, and work background as Johnson, who could perform light work except they could only occasionally climb ladders, ropes, and scaffolds, frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs could perform the light strength unskilled jobs of housekeeping cleaner, DOT 323.687-014, SVP 2, with approximately 177,900 jobs in the national economy; storage facility rental clerk, DOT 295.367-026, SVP 2, with approximately 68,650 jobs in the national economy, and

routing clerk, DOT 222.687-022, SVP 2, with approximately 118,000 jobs in the national economy. (Tr. 62-63).

If a hypothetical individual needed to sit down, walk around, or stretch for a minute or two to alleviate discomfort, they would be able to perform the identified jobs. (Tr. 64). If a hypothetical individual needed two extra breaks in addition to what is customary and the employer permitted that, the VE would classify that as accommodated work. (Tr. 64-65).

In the VE's opinion, any off-task behavior that would exceed 10 percent would be work preclusive for unskilled work. (Tr. 63). Additionally, any occurrence of greater than eight, full-day absences during a 12-month period are likely to violate[2] most employers' attendance policies. (Tr. 63). According to the VE, his testimony was consistent with the Dictionary of Occupational Tiles, with the exception of time off task and absenteeism which is not covered in the DOT. (Tr. 63-64).

## IV.    The ALJ's Decision

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2020.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of October 15, 2018, through her date last insured of September 30, 2020 (20 CFR 404.1571 et seq.).

3. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the lumbar spine and mild scoliosis; plantar fasciitis and flat feet; and obesity (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

---

[2] This word was transcribed as "inaudible," however given the context I presume the VE's statement was violate.

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally climb ladders, ropes, and scaffolds. She can perform frequent balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs.

6. The claimant has no past relevant work (20 CFR 404.1565).

7. The claimant was born on April 9, 1975, and was 45 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from October 15, 2018, the alleged onset date, through September 30, 2020, the date last insured (20 CFR 404.1520(g)).

(Tr. 39-44).

## V.    Law & Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.    whether the claimant is engaged in substantial gainful activity;

2.    if not, whether the claimant has a severe impairment or combination of impairments;

3.    if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.    if not, whether the claimant can perform their past relevant work in light of his RFC; and

9

5.     if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.     Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error

10

was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI.    Discussion

Johnson appeals raising the following assignment of error:

> The ALJ committed reversible error by failing to properly consider the diagnosis and effects of the Plaintiff's chronic fatigue syndrome and failing to include corresponding limitations in her RFC.

(ECF Doc. 9, p. 8).  The Commissioner argues that "there were other causes of Plaintiff's fatigue and muscle weakness/aches – namely Vitamin D and B12 deficiencies – that the ALJ considered sufficient to find that Plaintiff's CFS was not an MDI." (ECF Doc. 11, p. 4). I first turn my attention to whether the ALJ properly considered Johnson's Chronic Fatigue Syndrome ("CFS") diagnosis at Step Two.

The central question at Step Two is whether the claimant has a medically determinable impairment or combination of impairments that substantially limits [their] ability to perform

11

basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii). Claimants must make a *de minimis* showing that their impairment or combination of impairments is severe enough to interfere with their ability to work. *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987). Although the Step Two threshold is "lenient," claimants still must show that their claim is grounded in medical evidence and affected their ability to work prior to the date last insured. *Higgs v. Bowen*, 880 F.2d 860, 862-63 (6th Cir. 1988).

However, "'an ALJ's conclusion that an impairment is non-severe is not tantamount to a conclusion that the same impairment—either singly or in combination with a claimant's other impairments—does not impose *any* work-related restrictions.'" *Patterson v. Colvin*, No. 5:14-CV-1470, 2015 WL 5560121, at *4 (N.D. Ohio Sept. 21, 2015) quoting *Katona v. Comm'r of Soc. Sec.*, No. 14-CV-10417, 2015 WL 871617, at *6 (E.D. Mich. Feb.27, 2015). "Where an ALJ determines that non-severe impairments do not result in any work-related restrictions or limitations, the ALJ 'is required to state the basis for such conclusion.'" *Patterson*, 2015 WL 5560121, at *4 quoting *Hicks v. Comm'r of Soc. Sec.*, No. 12-13581, 2013 WL 3778947, at *3 (E.D. Mich. July 18, 2013).

Both Johnson and the Commissioner agree that SSR 14-1p governs how the ALJ considers CFS. (*See* ECF Docs. 9, p. 8; 11, p. 4). Pursuant to SSR 14-1p, CFS "is a systemic disorder consisting of a complex of symptoms that may vary in frequency, duration, and severity." "The CDC and other medical experts characterize CFS, in part, as a syndrome that causes prolonged fatigue lasting 6 months or more, resulting in a substantial reduction in previous levels of occupational, educational, social, or personal activities. In accordance with the CDC case definition of CFS, a physician should make a diagnosis of CFS "only after alternative medical and psychiatric causes of chronic fatiguing illness have been excluded." SSR 14-1p(I).

Pursuant to the CDC case definition, in addition to fatigue, additional diagnostic symptoms include: post exertional malaise lasting more than 24 hours, self-reported impairments in short-term memory or concentration, sore throat, tender cervical or axillary lymph nodes, muscle pain, multi-joint pain without joint swelling or redness, headaches, and waking unrefreshed. SSR 14-1p(I)(B)(1).

Further, SSR 14-1p dictates how the agency will determine whether CFS is one of the claimant's medically determinable impairments ("MDI").

> We will find that a person has an MDI of CFS if a licensed physician diagnosed CFS, and this diagnosis is not inconsistent with the other evidence in the person's case record. Under the CDC case definition, a physician can make the diagnosis of CFS based on a person's reported symptoms alone after ruling out other possible causes for the person's symptoms.[3] However, as mentioned, statutory and regulatory provisions require that, for evaluation of claims of disability under the Act, there must also be medical signs or laboratory findings before we may find that a person has an MDI of CFS. If we cannot find that the person has an MDI of CFS but there is evidence of another MDI, we will not evaluate the impairment under this SSR. Instead, we will evaluate it under the rules that apply for that impairment.

SSR 14-1p (II)(A)(2).

> Here, at Step Two the ALJ found as follows:

> Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the lumbar spine and mild scoliosis; plantar fasciitis and flat feet; and obesity (20 CFR 404.1520(c)).

> The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

> The claimant was also diagnosed with the following: vitiligo, allergies/sinusitis, celiac disease, diverticulitis, anemia, vitamin D and B12 deficiency. (Exs. 1F, 4F, 7F, 10F). These impairments, considered singly or together, have caused only transient and mild symptoms and limitations, are well controlled with treatment,

---

[3] Footnote 20 to SSR 14-1p states: Some examples of other disorders that may have symptoms that are the same or similar to those resulting from CFS include Addison's disease, Cushing's syndrome, hypothyroidism, iron deficiency, B12 deficiency, iron overload syndrome, diabetes mellitus, cancer, upper airway resistance syndrome, sleep apnea, rheumatologic disorders, multiple sclerosis, Parkinsonism, myasthenia gravis, Lyme disease, and chronic hepatitis.

have not met the 12 -month- durational requirement, or are otherwise not adequately supported by the medical evidence in the record. Accordingly, the undersigned finds that these impairments do not constitute severe medically determinable impairments (20 CFR 404.1545).

(Tr. 39-40).

The Commissioner argues that "there were other causes of Plaintiff's fatigue and muscle weakness/aches – namely her Vitamin D and B12 deficiencies – that the ALJ explicitly considered sufficient to find that Plaintiff's CFS was not an MDI." (ECF Doc. 11, p. 4). I disagree with the manner in which the Commissioner frames the issue. While I do agree that the ALJ considered Johnson's Vitamin D and B12 deficiencies and found these to be non-severe impairments, I do not agree that such decision satisfies the ALJ's duties regarding the consideration of CFS.

First, the Commissioner consistently misstates the standard of SSR 14-1p by arguing that because Johnson's vitamin deficiencies are consistent with her fatigue, she "cannot show her subjective complaints of fatigue and muscle weakness were inconsistent with her Vitamin D and B12 deficiency diagnosis." However, that is not what the rule requires. SSR 14-1p states that CFS will be considered an MDI "if a licensed physician diagnosed CFS, and this diagnosis is *not* inconsistent with the other evidence in the person's case record." SSR 14-1p (II)(A)(2) (Emphasis added). The ruling uses a double negative, meaning that a CFS diagnosis, once rendered, must be assessed against all other evidence contained in the record to determine if it is consistent. SSR 14-1p. It is not sufficient to ascribe the symptoms to other diagnoses, and summarily dismiss the CFS diagnosis without mention or discussion. Accordingly, the Commissioner's argument that Johnson cannot show her CFS complaints are inconsistent with Vitamin D and B12 deficiencies is without merit.

14

Here the record contains: a diagnosis of CFS (Tr. 384), Johnson's reports of subjective symptoms consistent with CFS in the medical record (*See, e.g.*, Tr. 383) and at the hearing before the ALJ (Tr. 57), and diagnostic testing regarding Johnson's vitamin deficiencies (Tr. 376, 377, 385, 386, 431-32), yet none of this is discussed by the ALJ. Given the scant discussion of Johnson's impairments, I cannot divine if the ALJ determined that Johnson's diagnosis of CFS was not a medically determinable impairment, pursuant to SSR 14-1p, or whether the ALJ merely overlooked the diagnosis in its entirety. *See Shrader*, No. 11-13000, 2012 WL 5383120, at *6. For that reason, I cannot find that the ALJ crafted an accurate and logical bridge between her Step Two findings and the medical evidence. *See Fleischer*, 774 F. Supp. 2d at 877. I therefore must recommend that the issue be remanded for the ALJ to consider whether Johnson's CFS was a severe impairment.

Plaintiff also raises issue with the ALJ's failure to include CFS limitations in the RFC. (ECF Doc. 9, p. 8). As Johnson correctly notes, "[t]he ALJ's failure to recognize chronic fatigue was a severe impairment would be harmless if she had still considered Plaintiff's chronic fatigue symptoms at steps three, four, and five . . . ." (*Id.* at p. 10). Regardless of whether the ALJ finds CFS to be a severe or non-severe impairment, the ALJ must still consider it when forming the RFC. *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 388 (6th Cir. 2013) ("[T]he ALJ's assessment of residual functional capacity reflects a claimant's functional capacity in light of all his limitations, not just those that are severe."). "Courts within the Sixth Circuit have repeatedly held that 'an ALJ's failure to adequately explain how an impairment affects an individual's RFC may constitute reversible error.'" *Patterson v. Colvin,* No. 5:14-CV-1470, 2015 WL 5560121, at *4 (N.D. Ohio Sept. 21, 2015) quoting *Katona v. Comm'r of Soc. Sec.*, No. 14-CV-10417, 2015 WL 871617, at *7 (E.D. Mich. Feb.27, 2015). In reading the ALJ's decision in its entirety, I

found no discussion of CFS, let alone any mention of fatigue outside of a single reference to muscle fatigue in the recitation of Listing 1.15 (Tr. 40), and in that I find reversible error. Again, because the ALJ did not articulate CFS at Step Two, nor discuss it when forming the RFC, I cannot determine whether her consideration of CFS was proper or if the RFC is appropriate for Johnson's impairments.

## VII.    Recommendation

Because the ALJ failed to apply proper legal standards in failing to build an accurate and logical bridge between her findings and the record, I recommend that the Commissioner's final decision denying Johnson's application for disability insurance benefits be vacated and that Johnson's case be remanded for further consideration of her Chronic Fatigue Syndrome diagnosis both at Step Two and in determination of the RFC.


Dated: July 24, 2025

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the

United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).